EXHIBITS

*E. Rymsza*

# IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA    :
      :      CR-1224-2023
      :
vs.      :
      :      MOTION TO SET BAIL
KENNETH MICHAELS,      :
    **Defendant**      :

## OPINION

On August 31, 2023, the Defendant was charged with an open count of Criminal Homicide[1] and one count of Possessing Instruments of Crime[2]. The charges stem from an incident on August 17, 2023, in which the Defendant fired a single shot in the lobby of his business after opening a locked door to allow entry to his irate former business partner and brother-in-law, John Roskowski ("decedent"), fatally wounding him. The Defendant was arrested in New Jersey on September 1, 2023. He waived extradition and was returned to Pennsylvania on or about September 14, 2023.

A preliminary arraignment was held on September 14, 2023, before Magisterial District Justice William Solomon who declined to set bail. A preliminary hearing was held on September 22, 2023, before Magisterial District Justice Solomon and both charges were held for court. Bail was again denied, due to the nature of the open count of homicide and its possibility of a life sentence if convicted. The Defendant's Motion to Set Reasonable Bail was filed on October 23, 2023. An evidentiary hearing was held on November 8, 2023, and November 14, 2023, after which the Court provided counsel the opportunity to submit

---

1 18 Pa.C.S. §2501(a).
2 18 Pa.C.S. §907(b).

1



written briefs in support of their positions. The Commonwealth's Brief in Opposition was filed on November 28, 2023, and the Defendant's Brief in Support of the Motion to Set Reasonable Bail was filed on December 1, 2023.

**Legal Analysis**

Article I, Section 14 of the Pennsylvania Constitution, which was amended in 1998, states as follows with regard to bail:

> All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great . . . .

Pa. Const. art. I, § 14.

The opening clause establishes a right to bail for all prisoners, while the remainder of the text provides an exception to the right for three classes of defendants. *Commonwealth v. Talley*, 265 A.3d 485, 513 (Pa. 2021). That right embodies three core tenets of our system of criminal justice: "(a) the importance of the presumption of innocence; (b) the distaste for the imposition of sanctions prior to trial and conviction; and (c) the desire to give the accused the maximum opportunity to prepare his defense." *Id.* at 499, quoting *Commonwealth v. Truesdale*, 296 A.2d 829, 834-35 (Pa. 1972).

To satisfy one of these exceptions, the Commonwealth must offer "evident" proof or establish a "great" presumption that the accused: (1) committed a capital offense, (2) committed an offense that carries a maximum sentence of life imprisonment, or (3) presents a danger to any person and the community, which cannot be abated using any

2

available bail conditions. *Talley*, 265 A.3d at 513. While the amendment expanded the class of nonbailable prisoners, the requisite proof needed to deny them bail did not change. *Id.* at 499. If the Commonwealth fails to satisfy its burden of proof, the trial court cannot deny bail. *Id.* at 513. Here, in order for the Court to deny bail, the Commonwealth must prove that it is substantially more likely than not that the Defendant will be convicted of first degree murder at trial. *Id.* at 525. More simply stated, the Commonwealth must convince the Court that it is substantially more likely than not that (1) John Roskowski is dead; (2) the Defendant killed him; and (3) the Defendant did so with the specific intent to kill and with malice.

The first two elements are not in dispute. It is the third element, specific intent to kill and malice, which is at issue. "Intentional killing" is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing." 18 Pa.C.S. §2502(d). "Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." *Commonwealth v. Jordan*, 65 A.3d 318, 323 (Pa. 2013). "It is well established in Pennsylvania that specific intent to kill can be formed in a fraction of a second, and may be found whenever a defendant acts with a conscious purpose to bring about the death of the victim." *Commonwealth v. Fisher*, 769 A.2d 1116, 1124 (Pa. 2001).

At the bail hearing, the Commonwealth presented the testimony of a number of witnesses in support of its position. Justin Segura, a Detective with the Lycoming Regional Police Department, conducted a recorded interview with the Defendant on August 17, 2023, and a follow-up interview on August 25, 2023. The Commonwealth played the interviews in

3

their entirety. The Commonwealth also called the forensic pathologist who performed the autopsy on the decedent, the Detective who photographed and packaged the handgun seized from the Defendant, the Adult Probation Officer who responded to the scene and confirmed at the hearing the still shot of the location of the decedent's body in the lobby of Cable Services, and the administrative assistant who worked in the front office next to the door and alerted the Defendant that the decedent was on the property. The Defense presented the testimony of Captain Chris Kriner of the Lycoming Regional Police Department.

 The Defendant, through his interviews following the incident – first with Detective Segura and with Detective Sorage of the Lycoming County District Attorney's Office during the follow up interview – relayed that he is married to the sister of the decedent and he and the decedent were longtime business partners until the Defendant completed a buyout of the decedent's shares in the company originally founded by the decedent's father. The Defendant described the decedent's history of drug use and violent temper, including prior occasions where he was personally assaulted by the decedent. One such altercation occurred in or around September 2021, which ultimately resulted in the decedent being charged. This was corroborated by the testimony of Captain Christopher Kriner at the bail hearing. (T.P. 11/14/23, pg. 76). The Defendant indicated during the interview that he remained in constant fear of the decedent. The Defendant indicated not only that he personally was in fear of the decedent, but also stated of the employees at Cable Services that "everybody was scared of the guy- he was a maniac."

 Samantha Edwards, administrative assistant at Cable Services, testified as a witness for the Commonwealth at the bail hearing.  At the time of the incident, Ms. Edwards's work

4

station was in the front office next to the door but she previously had an office in the fleet

garage which was a separate building on the property where they maintained the vehicles

and the mechanics primarily worked. (T.P. 11/14/23, pg. 52-53). Although the decedent no

longer worked at the business, he "visited often" because his son continued to work for the

business and the decedent was friends with the mechanics in the fleet building. Id. at 55. Ms.

Edwards testified that she had a friendly relationship with the decedent, that she was not

scared of him, that he was not a "maniac" towards her, and that she had never seen him

involved in any conflicts or disturbances with fellow employees. Id. at 57-58. She further

testified that she was not scared of John Roskowski. Id. On cross examination, Ms. Edwards

testified that she was aware of the prior conflict between the Defendant and the decedent,

including the incident where the Defendant was assaulted by the decedent at the business in

2021. Id. at 63. However, she also testified that the decedent had been back in the building

on more than one occasion following that incident and that the Defendant was aware of his

presence and had allowed him on the premises. Id. at 53-54. When asked by the First

Assistant District Attorney "if a person is outside of your – the door to your business and

does not have an access pass, are they able to get into the business unless you either buzz

them in or someone opens the door from the inside?" Ms. Edwards responded "No." Id. at

59.

    Ms. Edwards testified that on the date of the incident, August 17, 2023, the decedent

showed up outside of the business and rang the buzzer. Unlike previous occasions when Ms.

Edwards would let the decedent into the building, upon hearing the buzzer and seeing the

decedent at the door on August 17, 2023, she immediately left her desk and walked to the

Defendant's office and instructed her colleagues not to open the door. This was because the day prior the Defendant had instructed the fleet that the decedent was not welcome on the property. Id. at 65. Ms. Edwards was aware of this meeting because the Defendant spoke to her afterwards and let her know he "instructed them that Johnny was not allowed on the property. They should call 911 if he should come back and he was going to ask Lynn to remind him that he wasn't allowed on the property." Id at 72. When asked what she did when the decedent arrived at the business and rang the buzzer, Ms. Edwards testified:

A: I instructed the girls not to open the door and I went to let Ken know that he was here, should I let him in?

Q: Okay. Why did you tell the girls not to open?

A: Because I wasn't sure how Ken wanted to handle it.

Q: All right. So then tell me what you did next.

A: I just went back the hall, told Ken, John was at the front door, should I let him in and he said no, I'll handle it.

Q: And then what happened?

A: He reached behind the desk to grab something. I didn't see what he was grabbing, and I turned and stepped into the next door way and he went towards the front to address Johnny.

Q: Did you hear anything – could you hear anything that was being said after Ken went to the front?

A: Mostly what I heard was Johnny calling him a coward. Why couldn't you talk to me? Why did you have to have your sister call me? Basically just repeatedly called him a coward.

(T.P. 11/14/23, pg. 59-60).

During his second interview with law enforcement, the Defendant stated he brought the handgun used to shoot the decedent with him from home to work on the morning of the

6

incident. He did so with the expectation that the decedent would return to the business on that day and in spite of the fact that he already had a pistol in his safe at the office. He left the gun's holster in the center console of his car and carried the gun into the building in his pocket. The Defendant indicated that he previously purchased the handgun he brought to work with him that day "for accuracy" and placed it in his desk drawer upon arriving at the office. A can of mace was also present in the Defendant's desk. Upon Ms. Edwards notifying him that the decedent was at the door, the Defendant retrieved the handgun from his desk drawer, placed it in his left pocket, and walked down the hallway to the front door. The Defendant told police during their interview that he was not upset or nervous going to talk to the decedent and his thoughts were along the lines of "stay calm so you don't react poorly – I know John, I have a history with him, I was assaulted by him twice, I didn't know what mood he was in, it wasn't a good sign he was hammering on the buzzer because John is violent and has a horrible temper." Defendant explained that he got to the first door thinking "keep him outside" and stated "I just couldn't let him in the building." However, when asked by Detective Sorage why he didn't just talk to the decedent through the door and tell him to go away, the Defendant said he "actually never thought of that."

Instead, when the Defendant got to the lobby, he opened the locked door separating himself from the decedent, who up until that point had continued to angrily press the buzzer while seeking access to the building. In his first police interview, Defendant indicated that he opened the door and attempted to talk to the decedent but the decedent was irate and cussing. With the door no longer locked, however, the decedent entered the approximately 14'x14' lobby, and, according to the Defendant, he "knew" the decedent was going to grab

7

him so he started to back away from the door little by little, to get some separation. The

Defendant stated the decedent continued to scream at him while calling him, among other

things "a fucking coward." Defendant indicated several times throughout both interviews

that he told the decedent to stop and not proceed any further inside the building, but the

decedent took several steps towards him, paused for a moment, and "lunged" at him before

he pulled the trigger.

In his interview with Detective Segura and Detective Sorage, the Defendant

indicated that he instructed one of the employees to call 911 before the altercation resulted

in the gunshot. This was corroborated by Ms. Edwards at the bail hearing when she testified:

Q: Did you hear John make any threats towards Ken Michaels?

A: Threats, no.

Q: Did you hear the whole dialogue?

A: Mostly Johnny's voice. His voice carries, was a little elevated.

Q: Okay. Did you hear anything else after the words that you heard?

A: From the lobby between the two of them?

Q: No, just anything else?

A: I heard someone instruct someone to dial 911 and that's basically what I heard.

Q: And then what?

A: Pop.

(T.P. 11/14/23, pg. 60). The Defendant told the detectives that the decedent collapsed

immediately after he shot him. The Defendant did not start CPR on the decedent or move

him in any way. He told the detectives that he put the gun back in his left pocket, turned

8

around, and started walking back down the hallway. When police arrived minutes later, the

Defendant walked back through the lobby, past the decedent who remained in the same

position, and out the front door where an officer retrieved the still-loaded gun from his

pocket. At the bail hearing, the Commonwealth showed a still shot of the location of the

decedent's body in relation to the lobby door and a short excerpt of the body camera footage

taken by the first responding officer. (Commonwealth Ex. 8). The Commonwealth called

Torey Vansickle, Lycoming County Adult Probation Officer, who also responded to the

incident, to confirm that the images shown of the position of the body were consistent with

his observations when he arrived at the business on August 17, 2023.

Edward L. Mazuchowski, Chief of Forensic Pathology at Forensic Pathology

Associates, a division of HNL Lab Medicine in Allentown, Pennsylvania, was called as a

witness at the bail hearing. Defense counsel stipulated to Dr. Mazuchowski being qualified

as an expert in the field of forensic pathology for the purposes of the bail hearing only. Dr.

Mazuchowski performed the autopsy of John Roskowski on August 18, 2023, and prepared

a report which was admitted as Commonwealth's Exhibit 2. When asked to discuss his final

pathologic diagnoses and the basis for those findings, Dr. Mazuchowski testified as follows:

Q: Before I have you testify formally to the cause of death and the manner of death, can you discuss your final pathologic diagnoses and the basis for those findings?

A: Yes. In this case in the final pathologic diagnoses for Roman numeral one, the first one, there is a gunshot wound to the abdomen. So in this case there was a gunshot wound that was noted that had the entrance on the abdomen. In doing the internal examination that bullet injured the soft tissue, the mesentery, which is the kid of soft tissue in your abdomen, the liver, the stomach, the pancreas, the splenic artery, which is a major blood vessel supplying blood to the spleen and then the left renal artery, which is a major blood vessel supplying blood to the left kidney and the second lumbar vertebrae, which is one of your vertebral bodies posterior behind the abdomen.

9

. . .

Q: Did you find any evidence of hemorrhaging or blood loss in the abdomen?

A: Yes, there was. There was significant blood loss in the abdomen from that injury to the liver, the splenic artery, and also the left renal artery of about 2500 milliliters, so that's about half of an individual's blood volume. Most individuals have about 5,000 or 5 liters of blood and, in this case, 2500 milliliters or 2.5 liters were in the abdomen.

A: Are any of the injuries to the internal organs life threatening without medical intervention?

Q: Yes, they are. The injuries to the, as I stated, the liver, and the arteries, those major blood flow vessels are life threatening as well as the injuries to the pancreas can also be - - result in a lot of bleeding.

(T.P. 11/14/23, pg. 11-13). The fact finder may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Houser*, 18 A. 3d 1128, 1133-1134 (Pa. 2011). Malice, as well, may be inferred, from the use of a deadly weapon upon a vital part of a victim's body. *Id.*

Under Article I, Section 14, "proof is evident or presumption great" constitutes its own unique standard, one that lies in the interslice between probable cause and proof beyond a reasonable doubt." *Talley*, 265 A.3d at 522. "Unlike the *prima facie* standard, it requires both a qualitative and quantitative assessment of the evidence adduced at the bail hearing." *Id.* The Defendant argues that the Commonwealth, through the evidence presented at the bail hearing, has failed to meet its burden of production and persuasion with regard to whether the Defendant acted with a specific intent to kill. In his brief, the Defendant argues that he, "previously assaulted twice by the decedent at the same premises and believing he could be assaulted again by him, grabbed a firearm he had in his desk and placed it in his pocket and

10

went to the front of the building in an attempt to diffuse the situation by trying to speak with the decedent." (Defendant's Brief, 12/1/23, pg. 9-10). It further states "Mr. Michaels attempted to create a separation and speak to the decedent outside of the business premises. However, the decedent maneuvered his way into the lobby area and began to confront Mr. Michaels." Id. Defendant's brief points out that at 6 feet tall and approximately 258 pounds, the decedent was noticeably larger in stature than the Defendant. The Defendant attempted to back away from the decedent, who continued to provoke him by screaming and calling him a coward. The Defendant told an employee to call 911 just before the decedent lunged at him, at which time the Defendant pulled the trigger and shot the decedent.

In his brief in support of the Motion to Set Reasonable Bail, the Defendant argues that his conduct on the date of the incident is indicative of the state of mind not of a man who was looking for a reason to shoot someone, but rather of a man who was simply attempting to deescalate the situation and, tragically, killed the decedent in self-defense. The Court cannot agree. The Commonwealth's evidence at the bail hearing shows the Defendant had the opportunity to attempt to deescalate the situation by calling 911 while a locked door safely separated him from the decedent. Instead, when alerted that the decedent was at the front door, rather than calling 911 as he instructed his employees to do the prior day, the Defendant grabbed the handgun he brought from home that day in anticipation of the decedent returning. The Defendant chose to the handgun he purchased "for accuracy" over a can of mace in his desk drawer and another gun in his safe, and told the receptionist he would "handle it." Although the Defendant claimed that his first thought was that he could not let the decedent into the building, he stated in his interview with the detectives that

11

speaking with him through the intercom in an attempt to deescalate the situation did not

even enter his mind. The Defendant opened the locked door, allowing the irate decedent the

access to the building that he desired. Although the Defendant's account regarding the

decedent yelling obscenities and calling him names is undisputed, the Commonwealth's

witness testified that the decedent made no threats towards the Defendant. The Defendant

remained steadfast in his statements to detectives that the decedent took several steps toward

him before the Defendant pulled the handgun out of his pocked and then "lunged" at him

before the Defendant instructed the employee to call 911 and fired the single shot at close

range, striking the decedent in the abdomen. However, the Commonwealth's exhibit

showing the position of the body relative to the door would cause a reasonable factfinder to

question the credibility of those statements.

  As previously stated, in order to for the Court to deny the Defendant bail, the

Commonwealth must prove that it is substantially more likely than not that the Defendant

will be convicted of First Degree Murder at trial. As the first two elements of First Degree

Murder are not disputed, the argument centers around whether the Commonwealth has

established that it is substantially more likely than not that the Defendant acted with a

specific intent to kill. In his Brief in Support of Motion to Set Reasonable Bail, Defendant's

counsel states:

> "To meet its indisputably high burden of both proof and persuasion
> to support its charges and deny bail, the Commonwealth merely
> offers purported certitudes and conjecture regarding the incident on
> August 17, 2023. Conspicuously absent is citation to any
> legitimate fact-based evidence. Instead, the Commonwealth
> distorts insignificant facts, manufactures self-serving conclusions
> from them and even resorts to extremisms to justify denying bail in
> a case where it is patently appropriate. Further, they ignore

12

> irrefutable facts that simply do not support their effort to twist this
> event into a sinister, calculated cold-blooded murder, instead of an
> unfortunate tragedy."

While a jury will ultimately decide whether they believe beyond a reasonable doubt that the

Defendant killed the decedent with the specific intent to kill and with malice, for purposes of

the Defendant's Motion to Set Reasonable Bail and subsequent analysis under

*Commonwealth v. Talley, supra*, the Court disagrees with Defendant's counsel's blanket

rejection of all evidence presented by the Commonwealth in support of its position that the

Defendant acted with the specific intent to kill. To the contrary, this Court finds that the

Commonwealth's evidence regarding the Defendant's words and conduct and attending

circumstances showed that the Defendant's actions on August 17, 2023, were substantially

more likely than not willful, deliberate, and premediated.

Because the Defendant has steadfastly maintained that the killing of the decedent

was done in self-defense and therefore justifiable, the Court must also examine whether the

evidence established that it is substantially more likely than not that the Defendant

reasonably believe that he was in danger of death or serious bodily injury when he pulled the

trigger. The Defendant argues that the Commonwealth attempted to minimize the decedent's

actions, including yelling at the Defendant and repeatedly calling him a "fucking coward,"

and this behavior by the decedent was indicative of inviting and pursuing a physical

altercation. The Defendant argues that the words the decedent was using and the manner in

which he was using them "is firm support that he was threatening Mr. Michaels with

physical contact." (Defendant's Brief, 12/1/23, pg. 14-15). As a result of the behavior on the

part of the decedent, coupled with the two prior occasions where the decedent had engaged

13

in a physical altercation with the Defendant, the Defendant claims he reasonably believed he was in imminent danger of death or serious bodily injury and his killing of the decedent in self-defense was justified.

The Commonwealth vehemently contends that the Defendant's use of deadly force was not justifiable. The Commonwealth, to be successful, would need to show that it is more likely than not that the defendant did not reasonably believe that he was in immediate danger of death or serious bodily injury at the time he used the force and that, therefore, his belief that it was necessary for him to use deadly force to protect himself was unreasonable. Put another way, the Commonwealth must prove either: (i) that the defendant did not actually believe he was in danger of death or serious bodily injury such that he needed to use deadly force to defend himself at that moment; or, (ii) that while the defendant actually believed he needed to use such force, his belief was unreasonable in light of all the circumstances known to him. Pa. SSJI (Crim) §9.501. The requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant "must have acted out of an honest, bona fide belief that he was in imminent danger," which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis. *Commonwealth v. Mouzon,* 53 A.3d 738, 752 (Pa. 2012).

We reiterate that the Commonwealth's evidence at the bail hearing established that the Defendant brought a specific handgun with him to his office on August 17, 2023, in anticipation of the decedent returning to the business. When informed that the decedent was

14

at the door, instead of calling 911 as he had instructed his employees to do, the Defendant

retrieved the handgun from his desk drawer rather than the can of mace that was in the same

drawer, concealed it in his pocket, and proceeded to the lobby of the business where, at the

time, the decedent remained safely on the other side of a locked door. The Defendant was

aware that the decedent was angry and initially told detectives his mindset was to prevent

him from entering the building. However, despite repeatedly telling detectives that he was

afraid of the decedent due to his terrible temper and previous assaultive behaviors, the

Defendant opened the locked door, allowing the decedent entry to the building. When asked

what he thought the decedent would do if he grabbed him, the Defendant first told detectives

he "probably would have hit me, beat me," and later said he thought he would put him in the

hospital and cause serious injury. Although he yelled vulgarities at the Defendant, the

decedent made no threats. The decedent was unarmed and, in fact, made no physical contact

whatsoever with the Defendant. Although the decedent was taller and heavier than the

Defendant, the Defendant was aware that the decedent was in poor physical health. At most,

the decedent took some steps toward the Defendant, paused when the Defendant pulled the

handgun from his pocket, and "lunged" at him before the Defendant used deadly force,

striking the decedent once in the abdomen. This account by the Defendant, however, is quite

possibly contradicted by the physical evidence including the location of the decedent's body

in relation to the door of the building.

Based upon the evidence adduced at the bail hearing, the Court finds that the

Commonwealth has established that it is more likely than not that the Defendant did not

actually believe he was in danger of death or serious bodily injury such that he needed to use

deadly force to defend himself at that moment *or* if the Defendant actually believed he needed to use such force, his belief was unreasonable in light of all the circumstances known to him.

As the Court has found that the Commonwealth has satisfied its burden of proof and production with competent evidence that it is substantially more likely than not that Defendant has committed an offense that could result in a life sentence, the Court will detain the Defendant for trial without bail. The Defendant alternatively argues that Pennsylvania's maximum life sentence trigger for denying bail, both on its face and as applied, violates the Eighth and Fourteenth Amendments of the United States Constitution and urges the Court to release the Defendant on reasonable bail conditions. The Eighth Amendment to the United States Constitution states "[e]xcessive bail shall not be required. . ." Pursuant to *Stack v. Boyle*, 342 U.S. 1, 5 (1951), "[b]ail set at a figure higher than an amount reasonably calculated to assure the accused's presence at trial is excessive under the Eighth Amendment."

The Defendant argues that Article 1, Section 14 of the Pennsylvania Constitution essentially creates an irrebuttable presumption that every individual charged with murder where a life sentence is possible is incapable of assuring his appearance or is too dangerous to be granted release and denial of bail without any individualized consideration of the facts and circumstances of a particular defendant violates due process. Prior to 1998, Article I, Section 14 of the Pennsylvania Constitution made "all prisoners bailable by sufficient sureties, *unless for capital offenses*, when the proof is evident or presumption great . . ." and under this provision a "capital offense" meant a crime for which the death penalty could be

16

imposed. After Pennsylvania's death penalty scheme was invalidated in *Scoleri v. Pennsylvania*, 408 U.S. 934 (1972) and *Commonwealth v. Bradley*, 295 A.2d 842 (Pa. 1972), there were no longer any criminal offenses in the Commonwealth for which the death penalty could be imposed, and the court in *Commonwealth v. Truesdale*, 296 A.2d 829 (Pa. 1972), concluded "by mandate of our Constitution, all offenses are bailable prior to trial." Once Pennsylvania's death penalty statute was revised and withstood constitutional challenges, the General Assembly passed Joint Resolutions proposing an amendment to Article 1, § 14 of the Pennsylvania Constitution to change the first clause to read:

> All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great . . . .

Pursuant to Section 201.1 of the Pennsylvania Election Code, the Attorney General of Pennsylvania prepared a "plain English statement" identifying the "purpose, limitations and effects of the ballot question" to be submitted to the electorate to amend Article 1, § 14 of the Constitution. The Attorney General explained, in part:

> The purpose of the ballot question is to amend the Pennsylvania Constitution to add two additional categories of criminal cases in which a person accused of a crime must be denied bail… The ballot question would amend the Constitution to disallow bail in cases in which the accused is charges with an offense punishable by life imprisonment or in which no condition or combination of conditions other than imprisonment of the accused will reasonably assure the safety of any person and the community . . . It would require that the proof be evident or presumption great that the accused committed the crime or that imprisonment of the accused is necessary to assure the safety of any person and the community.
> The proposed amendment would have two effects. First, it would require a court to deny bail when the proof is evident or presumption great that the accused committed a crime punishable by death or life imprisonment. Second, it would require a court deciding whether or not to

allow bail in a case in which the accused with a crime not punishable by death or life imprisonment to consider not only the risk that the accused will fail to appear for trial, but also the danger that release of the accused would pose to any person and the community.

A majority of the electorate approved the amendment to Article 1, § 14 during the 1998 general election, thus creating an "exception to the right to bail" for any offenses "for which the maximum sentence is life imprisonment."

As the Court has found that the Commonwealth has presented sufficient evidence to establish that it substantially more likely than not that the Defendant will be convicted of an offense for which the maximum sentence is life imprisonment, the Court is obligated to deny bail pursuant to Article 1, §14 of the Pennsylvania Constitution. The factors the Defendant urges the Court to consider pursuant to Pa.R.Crim.P. 523(A) and whether or not the Defendant is likely to appear at future hearings are not applicable in this instance.

Accordingly, the Court will enter the following Order:

## ORDER

**AND NOW** this **13**th day of **February, 2024,** after careful consideration of the arguments of counsel and the supplemental briefs filed by each counsel in support of his position, and for the reasons set forth above, the Defendant's Motion to Set Reasonable Bail is **DENIED.**

By the Court,

Ryan M. Tira, Judge

RMT/jel
CC:    DA (MLW)
       Edward J. Rymsza, Esq.
       Gary Weber, Esq.

18

Case 3:25-cv-01511-SAC    Document 1-1    Filed 08/15/25    Page 20 of 22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENNETH RICHARD MICHAELS | : | |
| | : | |
| Petitioner | : | No. 7 MDM 2024 |

Appeal from the Order Entered February 13, 2024,
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0001224-2023

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

JUDGMENT ORDER PER CURIAM:

Petitioner, Kenneth Richard Michaels, filed a "Petition for Specialized Review Pursuant to Rule 1610 of the Pennsylvania Rules of Appellate Procedure" ("Petition"), seeking review of the February 13, 2024 order of the Court of Common Pleas of Lycoming County, which denied Michaels bail.  Upon review, we affirm on the basis of the well-reasoned opinion authored by the Honorable Ryan M. Tira.[1]

Michaels was charged with criminal homicide and possession of a weapon stemming from the killing of his brother-in-law and former business partner, John Roskowski, at the business premises on August 17, 2023.[2]  A

---

[1] We are required to review the merits of the trial court's decision to deny bail. **See In the Int. of N.E.M.**, 311 A.3d 1088 (Pa. 2024).

[2] Despite the severity of the offenses charged, bail is not proscribed.  **See** Pa. Const. art. I, § 14; Pa.R.Crim.P. 520(A).  **See also Commonwealth v.**



bail hearing was held on November 8, 2023, and concluded on November 14, 2023, at which the Commonwealth presented the testimony of Detective Justin Segura, Dr. Edward Mazuchowski, Detective Jordan Mahosky, Torey Vansickle, and Samantha Edwards.    The Commonwealth additionally introduced two video interviews of Michaels, a pathologist report, an autopsy picture, a photo of the gun, a photo of a wallet, and body camera footage from the day in question.    Captain Chris Kriner testified on Michaels' behalf.  At the conclusion of the bail hearing, the trial court took the matter under advisement and subsequently issued an order and opinion on February 13, 2024, denying Michaels' petition for bail.

Michaels filed the instant Petition in this Court on March 8, 2024.    The Commonwealth filed a response on March 28, 2024.

Michaels raises two issues for our review:   1) whether the trial court abused its discretion in denying bail, and 2) whether Article I, Section 14 of the Pennsylvania Constitution is unconstitutional on its face and/or as applied to Michaels.

This Court reviews an order denying bail for an abuse of discretion.  **See Commonwealth v. Bishop**, 829 A.2d 1170, 1172 (Pa. Super. 2003). Moreover, this Court's scope of review from the denial of bail is limited to the record evidence adduced at the bail hearing and the findings of the lower court, reviewed in the light most favorable to the prevailing party.    **See**

**Talley**, 265 A.3d 485, 525-26 (Pa. 2021) (analyzing defendant's right to bail pursuant to Pennsylvania Constitution).

***Commonwealth v. Talley***, 265 A.3d 485, 527 (Pa. 2021). This Court will affirm the trial court's denial of bail "if [the court's] factual findings are supported by competent evidence of record, and [its] legal conclusions drawn therefrom are correct." ***Id.***

After reviewing the petition, the Commonwealth's response, and the applicable standard of review, we find the trial court did not abuse its discretion in denying Michaels' request for bail and affirm on the basis of the trial court's thorough and well-reasoned opinion.[3] ***See*** Trial Ct. Op., filed 2/13/24, at 3-18 (concluding: (1) Commonwealth established it was more likely than not that Michaels committed first-degree murder and would be subject to life imprisonment; (2) Commonwealth presented comprehensive evidence establishing that Michaels shot and killed an unarmed person; and (3) Commonwealth presented sufficient evidence to refute Michaels' claims of self-defense). The parties are directed to attach a copy of the trial court's opinion in the event of future proceedings.

Order affirmed.

---

[3] Michaels attempts to raise a challenge that Article I, Section 14 of the Pennsylvania Constitution violates the 8th and 14th Amendments to the United States Constitution; we find the argument is waived as underdeveloped. ***See Commonwealth v. Briggs***, 12 A.3d 291 (Pa. 2011) (finding that incorporation by reference is an unacceptable manner of appellate advocacy and that thus, those claims are waived). We decline to opine on the constitutionality of Michaels' claim.